UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ENGLISH-SPEAKING UNION, <br><br> Appellant, <br><br> v. <br><br> JAMES and GERALDINE JOHNSON, <br><br> Appellees. | Civil Action No. 02-605 (CKK) |

**MEMORANDUM OPINION**
(January 15, 2008)

This is an appeal of a ruling made by the United States Bankruptcy Court for the District of Columbia, arising out of Appellant English-Speaking Union's ("ESU") sale of its Washington, D.C. branch headquarters to James and Geraldine Johnson who, before paying ESU its note for part of the building's purchase price, filed for bankruptcy. The narrow issue on appeal is whether the Bankruptcy Court erred by deciding not to equitably subordinate the claim of Elm Company ("Elm"), a creditor, after its counsel testified at trial and, according to ESU (but belied by the record), indicated that Elm had submitted a fraudulently high claim for attorneys' fees to be paid from the bankruptcy proceeds. After thoroughly reviewing the Parties' submissions, case law, statutory authority, and the record as a whole, the Court shall affirm the ruling of the Bankruptcy Court for the reasons that follow.

**I. BACKGROUND**

*A.    Factual Background*

Although the issue presented on appeal is uncomplicated, the underlying facts are not. In 1993, ESU sold a piece of real property located in the District of Columbia to Mr. and Mrs.

Johnson (the "debtors").[1] *See* Elm's Br at 2. As part of the sale, ESU took back a note for a portion of the purchase price. *Id.* at 3. The debtors contemporaneously and subsequently obtained other loans that were secured by deeds of trust on the property, including several held by the Appellee, Elm. *Id.* 3-4. After the debtors filed for bankruptcy, they sold the property free and clear of its multiple liens pursuant to an order of the Bankruptcy Court, with the liens attaching to the approximately $840,000 in proceeds generated from the sale. *Id.* at 7. Elm filed a Motion for Summary Judgment seeking to establish, *inter alia*, the priority of liens on the proceeds. *Id.* The debtors, and two creditors – the United States Internal Revenue Service (the "IRS"), and American General Mortgage ("American General") – opposed the Summary Judgment Motion, but ESU (also a creditor) did not. *Id.* at 7-8. On August 2, 2001, the Bankruptcy Court issued its decision granting in part and denying in part Elm's Motion for Summary Judgment, which fixed the creditors' competing priorities and found that ESU's deed of trust lien was junior to the deed of trust liens held by Elm and American General. *Id.* At 8. Following that decision, the liens on the bankruptcy proceeds were subject to the following priorities:

| | |
|---|---|
| Elm: | First Deed of Trust for notes in the amount of $100,000 and $44,000 |
| Elm: | Second Deed of Trust for note in the amount of $100,000 |
| American General: | Second Deed of Trust for note in the amount of $141,000 |
| ESU: | Third Deed of Trust for note in the amount of $335,000 |

---

[1] Because ESU decided to forego a statement of facts in its appellate brief ("ESU's Br."), the Court shall cite to Elm's brief ("Elm's Br.") for purposes of this factual background.

*See* AR 310-344 (Order and Opinion, No. 99-10076 at 36-38 (Aug. 9, 2001)).[2]

After the Bankruptcy Court held a pre-trial conference at which ESU failed to appear, all Parties except ESU entered into a Settlement Agreement and filed a Motion to Enter a Settlement Agreement and Notice on September 5, 2001.  Elm's Br. at 8-10.  The Agreement presumed that the principal balance, interest, and attorneys' fees due to Elm and American General, combined with surcharges, fees, and an IRS lien, consumed all of the proceeds available for distribution. *Id.* at 9.  Accordingly, there were no proceeds left to be distributed to ESU because of its relatively low priority.  *Id.*  On October 29, 2001, the Bankruptcy Court set trial for November 19, 2001.  *Id.* at 10.  After seeking several extensions of time to file an objection to the settlement, ESU filed its Objections three days before trial, arguing that Elm's claim should be equitably subordinated for two reasons.  *Id.* at 11; AR 425-433 (Objection of ESU to Proposed Compromise and Settlement at 6-8 (Nov. 13, 2001)) (hereinafter "ESU Objection").  First, ESU questioned the amount of interest Elm was due on its notes.  *Id.* at 430-31.  Second, ESU argued that Elm's claim for attorneys' fees was too high because a large portion of those fees were generated pursuant to litigation that was not directly related to collection from the debtors.[3]  *Id.* at 431-32.  At trial on November 19, 2001, the Bankruptcy Court heard argument and testimony related to ESU's objections.[4]  Although ESU initially raised its first argument concerning the

---

[2] The proceeds were also subject to a relatively small IRS lien.  *See* Elm's Br. at 9.

[3]  The other litigation included proceedings to determine who had proper title to a disputed lien on the debtor's property.  *See* Elm's Br. at 5-6.  That litigation was resolved by a settlement agreement to which both Elm and the debtors were parties.  *Id.* at 6.  Further details regarding the collateral litigation are immaterial for purposes of the present appeal.

[4] All references to the transcript of the November 19, 2001 trial shall be denoted as "Tr."

interest on Elm's notes, *see* Tr. 53:5 ("[w]e dispute, for example, the interest"), that argument was eventually abandoned by ESU after the Bankruptcy Court made its factual findings with respect to the interest owed.  *See* Tr. 138:20-23 (having calculated the interest due on Elm's notes, the Bankruptcy Court informed ESU that it could examine the "calculations after today's hearing and let the Court know if there was an error," but ESU did not bring any error to the Bankruptcy Court's attention).  ESU has not appealed this portion of the Bankruptcy Court's ruling.  *See* ESU's Br. at 1 (limiting the issue on appeal to attorneys' fees).

Regarding Elm's claim for attorneys' fees, the Bankruptcy Court denied ESU's request to equitably subordinate Elm's claim because ESU had not raised that argument in its answer, had not raised it in response to Elm's Motion for Summary Judgment, had not attended the pretrial hearing, and had not submitted a pretrial statement.  The Bankruptcy Court did require testimony, however, concerning whether any portion of the attorneys' fees should be disallowed.  The Bankruptcy Court sought to determine, in particular, whether there would be any remaining funds to distribute to ESU if Elm could only recover the portion of attorneys' fees that were generated by direct litigation against the debtors (as opposed to any collateral litigation).  *See* Tr. 54:19-23 ("I am going to . . . require them to put on some proof of their claim and let you show me that they are wrong to assert that, at a minimum, the amounts owed are such that it exhausts the funds.").  The testimony that followed forms the basis for ESU's instant appeal.

Mr. Hayden, counsel for Elm, presented testimony that approximately $90,000 of pre-petition attorneys' fees were directly attributable to enforcing its notes against the debtors:

> Q:   And can you estimate for the Court, based on your review of the billing records as well as your knowledge of the proceedings as they have been along, what percentage of [the total legal fees were] actually attributable to

>   collection of the note as opposed to the [collateral litigation]?
>
> A: Yeah . . . directly related, in my view, to enforcing the note, dealing with the [debtors] on the escrow, protracted discovery, dealing with these other litigations, one-third would be directly related to that.
>
> Q: About $85,000?
>
> A: Something like that, right, plus [about half of an additional $20,000 billing] . . . which is almost exclusively [for the debtors].
>
> THE COURT: So you got $80,000 of the $240,000 and about $10,000 at least of the billing . . . ?
>
> Q: . . . yeah . . . so about $90,000 in aggregate legal fees that I would attribute to pursuing the [debtors] directly.

Tr. 76:21 - 78:2.  *See also* Tr. 143:5-10.

In addition to these pre-petition attorneys' fees, Elm incurred approximately $63,000 of post-petition attorneys' fees, which were indisputably attributable to enforcing Elm's notes against the debtors.  *See* Tr. 143:18-20 (finding by the Bankruptcy Court that "the $63,000 for outside counsel, which includes bankruptcy counsel, has to do with collection").

Setting aside the approximately $150,000 in attorneys' fees calculated above that were found to be directly related to Elm's collection efforts against the debtors, the Bankruptcy Court found that all of the other distributions with priority over ESU's claim totaled approximately $800,000:

>   THE COURT: So we got [American General] for $200,540 and the IRS for $3,058.80, and then we have got Elm.  And Elm is owed $244,000 in principal.  That is not disputed.  The default – the non-default rate of interest until the letter of acceleration on May the 1st, 1996, was $198,250, and then default interest was $91,000 at 2 percent per month.  And then – that is to the petition date, and then, after the petition date, there is $61,135.  Those are Mr. Greenfeld's calculations.  If there is an error in it, [ESU] can [look at] this calculation[] after today's hearing and let the Court know if there was an error, but I am going to assume that no

error will be discovered.

\* \* \*

THE COURT: And when all of those figures are totaled together, it comes to $596,580 owed to Elm. If you add the [American General] sum of $200,540 and the IRS sum of 3,058.80, you come up with $800,178 . . . . This is before we get into attorney's fees.[5]

Tr. 138-39, 143.

With approximately $800,000 allocated for uncontested priority distributions, and approximately $150,000 in attorneys' fees directly attributable to collection against the debtors, the Court found that even if ESU were correct that Elm could not recover the full amount of its attorneys' fees claim (which was apparently $225,000, *See* ESU's Objection at 7), these distributions clearly exhausted all of the bankruptcy proceeds (approximately $840,000) prior to ESU becoming eligible for a distribution:

> THE COURT: Now, the Court heard extensive evidence from Mr. Hayden about what attorney's fees have been incurred . . . . I believe it was roughly $90,000 of pre-petition attorney's fees were attributable to enforce the note against the Johnsons . . . . Suffice it to say that there is more than enough attorney's fees based on Mr. Hayden's testimony to exceed the $840,000 [the amount available for distribution] when those attorney's fees are added to the $800,000 approximate amount I have already calculated.

Tr. 144:16-22.

Having found no merit to ESU's objections, the Court proceeded to approve the proposed settlement. *See* Tr. 144:20-22.

### B.   *Procedural Background*

On November 28, 2001, ESU filed a notice of appeal pursuant to 28 U.S.C. § 158(a),

---

[5] This Court calculates the total as approximately $798,000, although the discrepancy is immaterial and may be due to rounding.

which gives district courts jurisdiction over "appeals . . . from interlocutory orders and decrees . . . of bankruptcy judges." On September 12, 2002, after receiving a series of extensions, ESU missed the deadline by which it was supposed to file its appellate brief. This court dismissed ESU's appeal with prejudice for failure to prosecute. *See* [8] Mem. Op. and Order at 1 (Sept. 12, 2002). The Court of Appeals for the District of Columbia Circuit reversed the dismissal, indicating that the Court dismissed the appeal "without sufficient explanation." *English-Speaking Union v. Johnson*, 353 F.3d 1013, 1021 (D.C. Cir. 2004). On remand, the Court reopened the case and requested briefing from both Parties. Rather than dismissing the appeal based on the missed deadline, the Court exercised its discretion to permit the late filing of ESU's brief on the merits. The appeal has been fully briefed on the merits and is ripe for decision.

## II.  LEGAL STANDARD

United States District Courts have jurisdiction over appeals of Bankruptcy Court decisions. *See* 28 U.S.C. § 158(a). Orders in bankruptcy cases may be immediately appealed as final orders if they dispose of discrete disputes within the larger case. *See In re St. Charles Preservation Investors, Ltd.*, 112 B.R. 469, 471 (D.D.C. 1990). On appeal from a bankruptcy court, a district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree, or remand with instruction for further proceedings. Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of witnesses." Fed. R. Bankr. P. 8013; *see also In re Ford Johnson* 236 B.R. 510, 518 (D.D.C. 1999). In contrast, a district court reviews questions of law *de novo* on appeal. *In re WPG, Inc.*, 282 B.R. 66, 68 (D.D.C. 2002) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

The burden of proof is on the party that seeks to reverse the bankruptcy court's holding, and that "party must show that the court's holding was clearly erroneous as to the assessment of the facts . . . and not simply that another conclusion could have been reached." *Ford Johnson*, 236 B.R. at 518. In adversary proceedings, Federal Rule of Bankruptcy Procedure 7052 provides that the district court's review parallels review under Federal Rule of Civil Procedure 52(a). Thus, an appellate court applying the "clearly erroneous" standard is not entitled to "reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the role of the lower court." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573 (1985). As such, a finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Ford Johnson*, 236 B.R. at 518 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

### III. DISCUSSION

ESU raises a single issue on appeal: whether the Bankruptcy Court erred by failing to equitably subordinate Elm's claim following the testimony of Elm's attorney that he allegedly "knowingly, willful[ly] and fraudulent[ly] submitted a falsely inflated proof of claim for attorney[s] fees." ESU's Br. at 1. Equitable subordination is a discretionary doctrine that allows a bankruptcy court to "sift [through] the circumstances surrounding any claim" and, when appropriate, subordinate for purposes of distribution any claim to any other allowed claim "when there is a showing of fraud, inequity, or unfairness." *Reiner v. Washington Plate Glass Co., Inc.*, 27 B.R. 550, 551 (D.D.C. 1982) (quoting *Pepper v. Litton*, 308 U.S. 295, 308 (1939)). The

doctrine is applied where a bankruptcy court finds three circumstances to exist: 1) a creditor engaged in some type of inequitable conduct; 2) the inequitable conduct resulted in injury to other creditors or conferred an unfair advantage on a claimant; and 3) the equitable subordination is not inconsistent with the provisions of the Bankruptcy Act. *See Washington Bancorporation v. Fed. Deposit Ins. Corp.*, No. 95-1340, 1996 U.S. Dist. LEXIS 3876 at *62 (D.D.C. 1996). Because the Court finds ESU's factual premise unsupported by the record – that is, Elm's counsel never provided testimony admitting to submission of a fraudulent claim – and because the record is clear that no inequitable conduct occurred and no prejudice to ESU existed, the Bankruptcy Court did not err nor abuse its discretion by refusing to equitably subordinate Elm's claim.

     *A.*     *Inequitable Conduct*

The Bankruptcy Court's refusal to equitably subordinate Elm's claim was a matter committed to its sound discretion, *see In re Poole, McGonigle and Dick, Inc.*, 796 F.2d 318, 321 (9th Cir. 1986), and a review of the record indicates that the Bankruptcy Court did not abuse that discretion. ESU failed to raise an equitable subordination claim or defense in its answer. *See* Tr 38:5. ESU decided, by its own admission, not to oppose Elm's Summary Judgment Motion even though it fixed the distribution priorities for the bankruptcy proceeds. *See* ESU's Objection at 5 ("ESU relinquished its legal arguments concerning priority to ensure that its hands remained pristine for the equitable consideration by this Court of the creditors' claims"). ESU also failed to file a pre-trial statement raising an equitable subordination claim, and failed to appear at the pre-trial hearing with the Bankruptcy Court and the other Parties. *See* Elm's Br. at 15-17. Only after the Parties appeared at trial, and only after the Court called ESU's counsel and asked him to

appear, did ESU finally make an appearance and raise an equitable subordination claim.  The Bankruptcy Court did not abuse its discretion by finding ESU's equitable subordination claim was untimely and prejudicial, as all of the Parties until the trial date had been negotiating with each other under the assumption that Elm's liens had been established.  *See* Tr. 51:3-8.  *See also* Tr. 38-7-8 (finding that the Parties had "worked hard towards achieving a resolution of the claim").  On this record, the Bankruptcy Court was well within its discretion to view ESU's argument as trying to obtain that which it was not entitled to receive after deciding *not* to oppose Elm's Motion for Summary Judgment that fixed the priorities of the Parties.  *See* Tr. 33:15-16 ("it is awful[ly] late in the day to be raising [equitable subordination]).

Despite the Bankruptcy Court's unwillingness to hear ESU's belated equitable subordination claim, the Bankruptcy Court agreed to hear extensive argument and testimony concerning the attorneys' fees that ESU claimed were fraudulently inflated.  The Court chose to characterize ESU's argument as one for disallowance, not as one for equitable subordination.  *See* Tr. 52:21-24 ("I don't think inflated means that you equitably subordinate.  It may mean you disallow the inflated portions, but I don't think that's grounds for equitable subordination"); Tr. 55:7-14 ("[t]he equitable subordination which you now tell me is just based on the claim being inflated, which I don't even think amounts to an equitable subordination defense, it goes to the merits of the amount . . . You don't throw out the baby with the bath water.  I mean, you might throw out the bath water, the inflated part, but you don't throw out the good part").  The Bankruptcy Court's decision to view ESU's argument as one of disallowance instead of equitable subordination was entirely appropriate.  *See Max. Sugerman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 n.16 (1st Cir. 1991) ("Only an 'allowed claim' . . . may be

subjected to equitable subordination under Bankruptcy Code § 510(c) . . . . Of course, if a proof of claim is filed but the claim is disallowed, the principles of equitable subordination never come into play. Disallowance means there is no debt owed by the estate, which moots any legal or equitable issues as to the holder's distributive rights in the assets of the estate.").

Elm's testimony concerning its claim for attorneys' fees, in any event, is the same testimony that would have been proffered had the Bankruptcy Court treated ESU's argument as an equitable subordination claim. On appeal, ESU argues that Elm's counsel admitted in his testimony that Elm submitted an inflated claim for attorneys' fees, and that the Bankruptcy Court made a finding of the same. ESU's Br. at 4, 9. This argument mischaracterizes both Elm's testimony and the Bankruptcy Court's findings.

ESU argues that Mr. Hayden, Elm's counsel, "admitted under oath that he had knowing[ly], willing[ly] and fraudulent[ly] inflated Elm's claim for attorney fees by more than $145,000." *Id.* at 4. A review of the record reveals that Mr. Hayden made no such admission. Instead, Elm argued to the Bankruptcy Court that all of the fees Elm included in its claim "were properly secured by loan documents." Elm's Br. at 12; *See* Tr. 44:18-22 ("Between [American General] and Elm, the legal fees are approaching $150,000, and we believe that those are fairly, clearly recoverable under any circumstance for post-bankruptcy litigation of the priorities of the deeds of trust and rights and claims of the parties."). Similarly mischaracterized is ESU's argument that the Bankruptcy Court "specifically ruled that the inflated claim requires equitable subordination." ESU's Br. at 9. A brief review of the transcript portion cited by ESU reveals this claim to be unfounded:

> THE COURT: I don't think inflated means that you equitably subordinate. It may

> mean you disallow the inflated portions, but I don't think that's grounds for equitable subordination.

Tr. 52. In other words, the Bankruptcy Court made the *exact opposite* finding than the one ESU attributes to the Bankruptcy Court. In reality, the Bankruptcy Court considered ESU's argument concerning the equitable subordination of Elm's claim, and found it unavailing. *See* Tr. 55:7-10 (concerning ESU's argument about an inflated claim, the Bankruptcy Court held that "I don't even think [it] amounts to an equitable subordination defense, it goes to the merits of the amount").[6]

Although the Bankruptcy Court did not make a finding as to the precise amount of attorneys' fees that would be properly paid to Elm out of the bankruptcy estate if there were unlimited funds available for distribution (Elm could not collect all of the attorneys' fees it claimed because there was only $840,000 available in the bankruptcy estate and other claims to be paid), the Court did make findings suggesting that Elm's claim was not fraudulently inflated. *See, e.g.*, Tr. 139:13 - 142:17 (finding fees related to a collateral dispute properly payable out of the bankruptcy proceeds); Tr. 143:7-20 (finding approximately $63,000 post-petition fees properly payable out of the bankruptcy proceeds); Tr. 143:5-16 (finding approximately $90,000 pre-petition fees properly payable out of bankruptcy proceeds).[7] These attorneys' fees clearly

---

[6] Similarly unfounded is ESU's claim that the Bankruptcy Court "stated prior to the admissions from Elm's counsel that the inflated claim was knowing and fraudulently tendered." ESU's Reply Br. at 11. ESU provides no citation to the 125-page trial transcript, nor could the Court locate any statement in the transcript that could remotely support such a claim. A review of the transcript leads to the precise *opposite* conclusion.

[7] These facts help to explain why, as ESU concedes, the Bankruptcy Court did not appear concerned that an alleged "fraud" had been committed. *See* Reply Br. at 11 (""[i]t is true, of course, that the Bankruptcy Court seemed singularly unfazed by the inflated claim").

exhausted the proceeds available for distribution prior to reaching ESU's lower priority claim. Because Mr. Hayden did not admit that Elm fraudulently submitted a claim for inflated fees, but rather, testified that there was no reasonable scenario under which ESU would be entitled to a distribution, and because the Bankruptcy Court did not find that Elm had submitted a fraudulently inflated claim for attorneys' fees, but rather, that Elm was due a significant portion of the fees it claimed, the Bankruptcy Court did not abuse its discretion by refusing to equitably subordinate Elm's claim.  In fact, reviewing the extensive record as a whole, the Court cannot identify any erroneous factual finding made by the Bankruptcy Court – let alone a clearly erroneous finding –  nor any improper legal conclusion reviewed by this Court *de novo*.[8]

B.     *Prejudice*

Even if ESU's argument were correct that Elm could not recover for the full amount of the attorneys' fees included in its claim, ESU would still have suffered no prejudice.  After distribution of the claims with higher priority than ESU's claim (setting aside Elm's claim for attorneys' fees), there was approximately $40,000 available for distribution.  The Bankruptcy Court found that Elm had incurred $63,000 in post-petition attorneys' fees, and at least $90,000 in pre-petition attorneys' fees directly related to collection against the debtors, all of which were properly claimed against the bankruptcy proceeds.  Even if the Parties disputed the actual amount

---

[8] The Court notes that ESU's Brief is inconsistent as to whether its claim is based on an allegedly inflated claim or only on the testimony provided by Mr. Hayden regarding the same. On the one hand, ESU makes an argument that the fees were inflated, but on the other hand, ESU argues that it had no inequitable conduct claim until Elm's counsel testified at trial.  *See* ESU's Br. at 9 ("equitable subordination in its pure form was not available to [] ESU until the Hearing . . . Until Mr. Hayden testified that he had willfully submitted a false claim, a claim of pure equitable subordination would be problematic.  After Mr. Hayden admitted to his inflated claim for attorney[s] fees, the claim became ripe.").  Neither argument has any basis in the record.

of fees due to Elm beyond these amounts, ESU would still not have been entitled to any distribution because the claims with higher priority exhaust the amount of available bankruptcy proceeds before ESU is owed a distribution. *See* Tr. 144:16-22 ("So, for all of those reasons, I think that the attorney's fees are vastly in excess of the amount necessary to bring the amounts that would be awarded to entities ahead of [ESU] to more than the $840,000 that is in the kitty, and I will approve – therefore, I overrule the objections of [ESU] and will approve the settlement."). Although ESU argues implausibly that it would have been included in settlement discussions with the other Parties had Elm's claim for attorneys' fees been lower, that argument is as speculative as it is illogical – the other Parties would have had no incentive to negotiate with ESU given that it could not have received any proceeds under *any* reasonable distribution scenario. As ESU suffered no prejudice as a result of Elm's claim for attorneys' fees, the Bankruptcy Court did not err by refusing to equitably subordinate Elm's claim.

      C.     *Calculation Error*

Elm's final argument that the Bankruptcy Court committed a mathematical error deserves only brief mention. ESU asserts that "[t]he amount actually requested by [American General], the only other creditor senior to the ESU, was $155,000," and not the approximately $200,000 that the district court used in its calculation at trial. *See* ESU's Br. at 6. This argument is meritless. American General did not "request" $155,000, but instead agreed to accept $155,000 as part of the settlement agreement with the other creditors. *See* Tr. 145:7-14. ESU's counsel specifically agreed at trial that American General's claim was approximately $200,000:

> THE COURT: The claim of [American General] was for $200,540 as of today's date, and I don't think [ESU] disputes the calculation of that amount. Is that a fair statement, Mr. Schwartz?

MR. SCHWARTZ: Yes, your Honor.

Tr. 137:25 - 138:3.

At the end of the trial, the Bankruptcy Court again explained the amount of American General's claim to ESU's counsel:

> MR. SCHWARTZ: Your Honor, before you leave the bench, there is one additional point, if I could raise it. It was not covered. Just so the record is complete, in the proposed settlement, [American General] agreed to be paid $155,000. As I understand your ruling, I don't think it would change the final result. As I understanding in your ruling, you have awarded them 200-and-some-odd-thousand dollars.
>
> THE COURT: No. That is not so. What I have done is I have said that if this matter went to trial, that is what they would receive, they have agreed, if they had priority, but in light of a dispute as to the effectiveness of a release made by [American General], they have obviously agreed to take a little bit of a haircut. And I have said in light of that – what I did was I analyzed what they would get if they were entitled to priority, if this matter were tried. That is $200,540.

*Id.* Because this Court finds that the Bankruptcy Court did not err in this calculation or otherwise, the Court shall affirm the ruling of the Bankruptcy Court overruling ESU's objections and finding no basis to equitably subordinate Elm's claim.

## IV. CONCLUSION

For the foregoing reasons, the ruling of the Bankruptcy Court is affirmed.

Date: January 15, 2008

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
